**NOT FOR PUBLICATION**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| DONALD CARROLL, on behalf of himself and those similarly situated,<br><br>Plaintiff,<br><br>               v.<br><br>HYUNDAI MOTOR AMERICA (CORPORATION) and GENESIS MOTOR AMERICA LLC,<br><br>Defendants. | No. 23-cv-1164<br><br><br>**OPINION & ORDER** |

**CECCHI, District Judge.**

Before the Court is defendants Hyundai Motor America, Inc. ("Hyundai")[1] and Genesis Motor America LLC's ("Genesis" and, collectively with Hyundai, "Defendants") motion to compel arbitration.[2]   ECF No. 36; *see* ECF No. 36-1 ("Moving Br.").   Plaintiff Donald Carroll ("Plaintiff") opposed the motion, ECF No. 41 ("Opp'n Br."), and Defendants replied, ECF No. 42 ("Reply Br.").   The Court decides the motion without oral argument.   Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b).   For the reasons set forth below, Defendants' motion to compel arbitration is granted and the case is stayed pending arbitration.

---

[1] Defendants note that the complaint incorrectly identifies Hyundai as "Hyundai Motor America (Corporation)."  Moving Br. at 1.

[2] Defendants also request reconsideration of the Court's February 26, 2024, Memorandum Order, ECF No. 26, denying their initial motion to compel arbitration, ECF No. 16, in light of the Third Circuit's October 2024 decision in *Young v. Experian Information Solutions, Inc.*, 119 F.4th 314 (3d Cir. 2024), *see* Moving Br. at 12–15.  Given the relief provided herein, the Court need not address that request.

## I.    BACKGROUND

### A.    Plaintiff's Complaint

This case arises out of the connected services technology features ("Connected Services") included in certain Hyundai and Genesis vehicles. *See generally* ECF No. 1 ("Compl."). Plaintiff is a New Jersey resident who purchased a 2017 Genesis G 80 at Sansone AutoMall in Avenelle, New Jersey. *Id.* ¶¶ 10, 32. Hyundai is a California corporation with its principal place of business in California engaged in the manufacture, importation, and distribution of automobiles, including Genesis vehicles. *Id.* ¶¶ 11, 14–16. Genesis is a California limited liability company with its principal place of business in California similarly engaged in the importation and distribution of Genesis vehicles. *Id.* ¶¶ 13–14. Hyundai "holds out Genesis as a division." *Id.* ¶ 15.

Plaintiff filed a putative class action complaint on February 28, 2023. *Id.* Plaintiff alleges that around 2014, Hyundai and Genesis introduced Connected Services in their automobiles which operated "using 3G networks." *Id.* ¶¶ 20, 22. Plaintiff claims that Hyundai and Genesis vehicles were equipped with Connected Services—which included an "SOS emergency button" and "crash reporting"—via "technology only compatible with 3G networks." *Id.* ¶¶ 2, 20, 23, 33. He alleges that in late 2022, Connected Services "ceased functioning" because "Verizon [stopped providing] 3G service." *Id.* ¶ 35.

Plaintiff alleges that "Defendants deceived [him] and [other] class members by marketing, promoting, selling[,] and leasing vehicles equipped with" Connected Services despite "knowing that the product was going to become obsolete" with the sunset of 3G networks. *Id.* ¶ 31. Specifically, Plaintiff alleges that Defendants "knew or should have known since the inception" of Connected Services that "3G would be replaced by later generation 4G and 5G networks" based on (i) Federal Communications Commission notices and announcements, (ii) public

announcements by telecommunications companies related to 4G transitioning, and (iii) communications between Defendants and Verizon during the design and development of Connected Services. *Id.* ¶ 24; *see also id.* ¶¶ 25–30. He also alleges that "[i]n purchasing [his] vehicle, [he] relied on the fact [that] the vehicle was equipped with" Connected Services and that neither Defendant disclosed that Connected Services "would cease functioning when the 3G network was closed." *Id.* ¶¶ 33–34.

Based on these allegations, Plaintiff—on behalf of himself and those similarly situated— brings claims for (i) violations of New Jersey's Consumer Fraud Act, (ii) breach of express and implied warranties, (iii) violations of the Magnuson-Moss Warranty Act, and (iv) unjust enrichment. *Id.* ¶¶ 7, 52–91.

## B.      Procedural History

On July 10, 2023, Defendants filed an initial motion to compel arbitration and stay the case pursuant to 9 U.S.C. §§ 3, 4 ("Initial Motion"). ECF No. 16; ECF No. 16-1. In their Initial Motion, Defendants argued that Plaintiff entered into a binding agreement with Defendants containing a valid, enforceable arbitration clause by agreeing to a Connected Services Agreement ("CSA"), which "govern[s] the 'provision of Connected Services' to Plaintiff." ECF No. 16-1 at 4; *see also id.* at 8–13. But because Plaintiff's complaint "makes no reference to the CSA," the Court found that "the question of arbitrability [could not] be resolved without considering the CSA, which is evidence extraneous to the pleadings." ECF No. 36 at 5. As such, the Court denied Defendants' Initial Motion on February 26, 2024 ("February 26th Order") and directed the parties to conduct limited discovery on the issue of arbitrability. *Id.* at 6. After limited discovery, Defendants filed their renewed motion to compel arbitration and stay the case pursuant to 9 U.S.C. §§ 3, 4 ("Renewed Motion"). *See* ECF No. 36; Moving Br.

### C.        The Factual Dispute Relevant to Arbitration

As mentioned above, the parties' arbitration dispute centers on the CSA, which governs the provision of Connected Services and contains an arbitration clause.  In relevant part, the CSA requires arbitration of "any and all disputes and claims between [Defendants and an individual user of Connected Services] arising out of or relating to . . . Connected Services, Connected Services Systems, Service Plans, [or] the Vehicle . . . to the maximum extent permitted by applicable law."  Moving Br. at 11 (quoting ECF No. 36-6 § 14.C(a)).  The CSA further states that (i) "[t]his agreement to arbitrate is intended to be broadly interpreted to make all disputes and claims between us subject to arbitration to the fullest extent permitted by law," (ii) "any arbitration will be governed by the substantive laws of the [individual user's] state," and (iii) the Federal Arbitration Act "governs the interpretation and enforcement of [the CSA's] arbitration provision." *Id.* (quoting ECF No. 36-6 § 14.C(a), (c)).  The CSA also provides that the arbitrator will determine "the scope and enforceability of [the CSA's] arbitration provision."  *Id.* (quoting ECF No. 36-6 § 14.C(c)).

Relevant here, individual users can enroll in or pay for Connected Services via Defendants' customer web portal ("CWP").  Moving Br. at 10; Reply Br. at 1, 5.  To enroll in Connected Services through the CWP, users must click a box next to the statement "[b]y checking this box, I agree to: . . . the [CSA] TERMS AND CONDITIONS," which itself contains a hyperlink to the CSA.  Moving Br. at 8, 19.

Defendants argue that Plaintiff (or his agent, as explained below) agreed to the CSA's arbitration clause when he re-enrolled his vehicle in Connected Services on December 24, 2022. *Id.* at 19.  In addition, they argue that Plaintiff could not have re-enrolled in Connected Services

in any other way, because their customer service agents are unable to process re-enrollment transactions over the phone. Reply Br. at 5–6.

Plaintiff "does not dispute that purchasing [Connected Services] . . . might present an opportunity to" agree to the CSA's arbitration clause. Opp'n Br. at 14–15. He also concedes that he, with the help of his son-in-law's sister Ana Martinez, tried to access the CWP to re-enroll his Genesis in Connected Services on December 24, 2022, as his enrollment had lapsed at the time. *See id*. at 6–7, 14. However, Plaintiff argues that neither he nor Ms. Martinez were able to successfully access the CWP. *Id.* at 7, 14. Instead, he states that he "purchased a monthly, auto-renewing [Connected Services] subscription for his vehicle over the phone on December 24, 2022—at the direction of Defendants' customer service agents." *Id.* at 14. Plaintiff states that he was "never told about any terms and conditions," never had the "opportunity to review" the CSA's terms, and thus could not have agreed to the CSA's arbitration clause. *Id.* at 7, 14–15.

## II.   <u>LEGAL STANDARD</u>

The Federal Arbitration Act ("FAA") reflects the strong federal policy in favor of arbitration and "places arbitration agreements on equal footing with all other contracts." *Bacon v. Avis Budget Grp., Inc.*, 959 F.3d 590, 599 (3d Cir. 2020) (citation omitted). Under the FAA, courts "compel arbitration of claims covered by a written, enforceable arbitration agreement." *Id.* (citing 9 U.S.C. §§ 3, 4). However, despite the strong presumption of arbitrability, "[a]rbitration is strictly a matter of contract" and is thus governed by state law. *Bel-Ray Co. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 441, 444 (3d Cir. 1999) ("If a party has not agreed to arbitrate, the courts have no authority to mandate that he do so."). Accordingly, when deciding whether to compel arbitration under the FAA, the Court must determine (i) whether "a valid agreement to arbitrate exists" and (ii) if so, whether "the particular dispute falls with the scope of the agreement," unless the valid

arbitration agreement "expressly delegate[s]" issues of scope and enforceability to the arbitrator. *Young*, 119 F.4th at 318, 321 (citation omitted).

Before reaching the question of whether it should compel arbitration, the Court must first decide whether to apply a Rule 12(b)(6) or Rule 56 standard. *Id.* at 319. In its February 26th Order denying Defendants' Initial Motion, the Court stated that after the parties conducted limited discovery it would review any renewed motion to compel arbitration pursuant to Rule 56. ECF No. 26 at 5–6. That limited discovery, which forms the basis of Defendants' Renewed Motion, is now complete. So, the Court will use the Rule 56 standard.

Under that standard, the party seeking to compel arbitration must show "'that there is no genuine dispute as to any material fact and [that it] is entitled to' an order compelling arbitration 'as a matter of law.'" *Adler v. Gruma Corp.*, 135 F.4th 55, 63 (3d Cir. 2025) (citation omitted). In considering whether a material issue of fact exists, the Court must "draw [all] inferences in favor of the non-moving party." *Young*, 119 F.4th at 318 n.7 (citation omitted).

## III.   <u>DISCUSSION</u>

For the reasons stated below, the Court finds that Plaintiff and Defendants entered into a valid agreement to arbitrate. Further, because that agreement delegates questions of scope and enforceability to the arbitrator, Plaintiff's argument that the Court must first determine whether the arbitration agreement covers his claims before compelling arbitration is without merit. Accordingly, the Court will grant Defendants' Renewed Motion and stay the case pending arbitration.

### A.   There Is No Genuine Dispute of Material Fact Precluding Enforcement of the CSA's Arbitration Clause

To determine whether the parties entered into a valid arbitration agreement, "[t]he Court applies state law principles of contract formation." *Earle v. BLST Sales, Mktg. & Servicing, LLC*,

No. 24-8983, 2025 WL 2170146, at *4 (D.N.J. July 31, 2025).  Both parties agree that New Jersey law applies.  *See* Moving Br. at 17, 21; Opp'n Br. at 15.

"Under New Jersey law, a party must prove the existence of a contract by showing that:" (i) "there was a meeting of the minds," (ii) "there was an offer and acceptance," (iii) there was consideration, and (iv) "there was certainty in the terms of the agreement."  *Price v. UBS Fin. Servs., Inc.*, No. 17-01882, 2018 WL 1203471, at *3 (D.N.J. Mar. 8, 2018) (citation omitted).  Here, the parties' dispute centers on offer and acceptance, namely whether Plaintiff ever agreed to the CSA.[3]

Defendants argue that Plaintiff agreed to the CSA's arbitration clause by enrolling in Connected Services through the CWP on December 24, 2022.  *See* Moving Br. at 19.  To support this, Defendants point to a business record showing that Plaintiff enrolled his vehicle, identified by VIN number, in Connected Services via the CWP on December 24, 2022.  *See* Moving Br. at 7; ECF No. 36-8 (business record showing Plaintiff's enrollment in Connected Services); ECF No. 36-5, Decl. of Vijay Rao, ¶¶ 9–10; ECF No. 36-3 ("Rao Dep.") at 64:17–25.  They also introduce a copy of a case summary report that catalogues all telephone and email communications between Plaintiff and Defendants' customer service agents related to Connected Services, which

---

[3] Plaintiff also argues that (i) there was no consideration given the lack of "delivery of service" and (ii) even if a "contract could be construed," "it was rendered impossible to perform and promptly voided by Defendants themselves."  Opp'n Br. at 15.  The Court finds both arguments unavailing.  On the first, "it [i]s the promise itself and not the performance of that promise that constitute[s] . . . consideration."  *Titan Stone, Tile & Masonry, Inc. v. Hunt Constr. Grp., Inc.*, No. 05-3362, 2007 WL 869556, at *9 n.6 (D.N.J. Mar. 20, 2007) (alterations in original) (citation omitted).  On the second, Defendants correctly point out that this is an issue of contract enforceability, not formation.  Reply Br. at 8; *see Eichlin v. GHK Co.*, 746 F. Supp. 3d 247, 253 (E.D. Pa. 2024); *see also Bakke v. Elamir*, No. A-3982-04T1, 2006 WL 2085393, at *4 (N.J. Super. Ct. App. Div. July 28, 2006).  As explained below, Plaintiff's enforceability-related arguments must be determined by the arbitrator because the CSA expressly delegates those issues to the arbitrator.

corroborates Defendants' account of events.  ECF No. 36-9; ECF No. 36-5 ¶ 12.  In addition, Defendants cite deposition testimony from their Director of Connected Ops & Owner Apps/Web, Vijay Rao, that Plaintiff could not have enrolled over the phone, because customer service "agents were not given [the] capability to" enroll new users or lapsed enrollments given Defendants' inability to document "acceptance of terms and conditions . . . over the phone."  Rao Dep. at 74:4–76:8.  As such, Defendants argue that either Plaintiff, or Ms. Martinez as his agent, agreed to the CSA's arbitration clause when he or Ms. Martinez used the CWS to reactivate Connected Services.  *See, e.g.*, Moving Br. at 2, 8, 19–21.

Plaintiff offers an alternative theory of events solely through his deposition testimony.  Plaintiff conceded at his deposition that he made at least "some effort to access" the CWP.  ECF No. 43 ("Carroll Dep.") at 42:19; *id*. at 47:17; Opp'n Br. at 14.  However, he testified that neither he nor Ms. Martinez[4] "could . . . get on [the CWP]."  Carroll Dep. at 47:17.  Instead, he argues that he reactivated Connected Services by "pa[ying] over the phone" and "was not provided with any contracts terms."  Opp'n Br. at 15; *see also* Carroll Dep. at 47:14–23 ("So the gentleman that we were speaking to at the time, I gave him my credit card number over the phone, and he said, okay, it should connect within an hour or so.").

The Court finds that Defendants have shown the absence of a material factual dispute relevant to whether Plaintiff agreed to arbitrate.  Courts routinely compel arbitration when the party opposing arbitration fails to seriously challenge business records or data unambiguously showing that he agreed to arbitration.  *See, e.g.*, *Macias v. Okla. CVS Pharma., LLC*, No. 23-966,

---

[4] Plaintiff does not dispute that Ms. Martinez acted as his agent during his attempt to re-activate Connected Services on December 24, 2022.  *See* Opp'n Br. at 14 ("Plaintiff further testified that neither he nor his agent, Ana Martinez, was able to access the Defendants' customer web portal during that call despite repeated efforts.").

2024 WL 4508581, at *4 (W.D. Okla. Oct. 16, 2024); *Kelly v. Madwire LLC*, No. 24-781, 2024 WL 5055581, at *3 (D. Colo. Oct. 4, 2024), *report and recommendation adopted*, No. 24-781, 2024 WL 5055580 (D. Colo. Oct. 22, 2024); *Crews v. Maxim Healthcare Servs., Inc.*, No. 21-1019, 2021 WL 2417732, at *3–4 (W.D. Tenn. June 16, 2021); *Martinez v. Capstone Rest. Grp., LLC*, No. 20-1017, 2021 WL 1723776, at *3 (D. Colo. Mar. 31, 2021); *Petrie v. GoSmith, Inc.*, 360 F. Supp. 3d 1159, 1163 (D. Colo. 2019); *Andre v. Dollar Tree Stores, Inc.*, No. 18-142, 2019 WL 2617253, at *6, *11 (D. Del. June 26, 2019).

For instance, in *Petrie*, the court addressed similar circumstances. There, the court compelled arbitration where defendant's position that plaintiff agreed to an arbitration agreement was "supported by data it routinely collect[ed] when users register on [its] website." 360 F. Supp. 3d at 1162. Specifically, defendant argued that plaintiff "assent[ed] to [its] Terms of Use, and thus the arbitration agreement, by affirmatively 'check[ing] [the] box to indicate his agreement to the Terms of Use and Privacy Policy, and [by] click[ing] 'See Job Matches.'" *Id.* (third, fourth, and sixth alteration in original). In response, plaintiff relied on "his own assertion that he did not accept [d]efendant's Terms of Use" and "challenge[d] the reliability of the data which allegedly indicate[d] that he registered on [d]efendant's website and agreed to the Terms of Use." *Id.* The court found these two arguments insufficient to avoid arbitration. After noting that "general denials . . . are insufficient to defeat arbitration," the court found that plaintiff failed to present "any evidence that would refute" defendant's data showing that he agreed to its "Terms of Use," which included an arbitration clause. *Id.* at 1162–63. As such, the court found no "genuine dispute of material fact with regard to the existence of an arbitration agreement." *Id.* at 1163.

Here, the Court similarly finds no genuine dispute of material fact as to the existence of an arbitration agreement. Plaintiff testifies to an alternative theory of events, but he has no alternative

explanation for or evidence specifically contradicting Defendants' records and testimony showing that he agreed to the CSA. *See Martinez*, 2021 WL 1723776, at *3 (compelling arbitration where plaintiff offered "no alternative explanation for the notation [of her digital signature] stating that she signed the arbitration agreement"). Indeed, Plaintiff's alternative theory—that he enrolled in Connected Services over the phone with a customer service agent—is not just rebutted by Defendants' business record documenting that his user account assented to the CSA through the CWP on December 24, 2022. *See* ECF No. 36-8. It is also rebutted by Mr. Rao's testimony and declaration that Plaintiff's alternative theory is impossible, given that the customer service agent he spoke to was not able to take payment information from those seeking to re-enroll in Connected Services. *See, e.g.*, Rao Dep. at 56:24–57:21 ("Agents are not allowed to enroll customers over the phone."); *id.* at 74:4–76:5 (testifying that, as of December 24, 2022, Plaintiff could not have re-enrolled in Connected Services over the phone); ECF No. 36-5 ¶ 11 ("Customer service agents are not authorized to process a payment or complete a customer's enrollment in Connected Services by telephone in circumstances such as these where the customer does not have an active enrollment."). And finally, Plaintiff's alternative theory is also rebutted by Defendants' case summary report that catalogues all telephone and email communications between Plaintiff and Defendants' customer service agents, which does not indicate that a customer service agent processed payment or re-enrolled Plaintiff in Connected Services. *See* ECF No. 36-9.

Thus, Plaintiff's argument that he reactivated Connected Services by providing his credit card information to an agent over the phone—without more evidence—is "insufficient to raise an issue as to" contract formation. *Barnes v. Festival Fun Parks, LLC*, No. 22-165, 2023 WL 4209745, at *5 (W.D. Pa. June 27, 2023) (citation omitted). With the evidence so "one-sided," the Court sees no genuine dispute of material fact to preclude finding a valid arbitration agreement.

10

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see Crews*, 2021 WL 2417732, at *3 ("Ultimately, Plaintiff's scant evidence is not sufficient to show a genuine issue of material fact as to whether Plaintiff signed the arbitration agreement.").

**B.      The CSA Delegates Questions of Scope and Enforceability to the Arbitrator**

If a valid arbitration agreement exists and the agreement delegates threshold questions of arbitrability—like scope or enforceability—to an arbitrator, a court may not decide those threshold issues. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019); *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 226 (3d Cir. 2018). However, a party can "challenge the provision delegating arbitrability to the arbitrator, but . . . must do so specifically." *Ackies v. Scopely, Inc.*, No. 19-19247, 2022 WL 214541, at *8 (D.N.J. Jan. 25, 2022).

Here, Plaintiff does not challenge the delegation clause specifically; he instead argues that the CSA's arbitration clause does not cover his claims. *See* Opp'n Br. at 15–17. Notwithstanding that argument, the CSA unambiguously states that "[a]ll issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement's terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement." Moving Br. at 23 (quoting ECF No. 36-6 § 14.C(c)); *see Stanford v. Azzur Grp., LLC*, No. 23-3017, 2024 WL 921027, at *4 (E.D. Pa. Mar. 4, 2024). Moreover, the CSA specifies that "[t]he arbitration will be governed by the Consumer Arbitration Rules . . . of the American Arbitration Association." Moving Br. at 23 (quoting ECF No. 36-6 § 14.C(c)); *see also Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 103 (3d Cir. 2020) (finding clear intent to delegate arbitrability issues where agreement stated "[a]rbitration shall be subject to . . . the then current Rules of the American Arbitration Association for Commercial Arbitration"). As such, the Court finds that the parties have delegated issues of arbitrability, such as scope and enforceability,

11

to the arbitrator.  *See Jean v. Bucknell Univ.*, No. 20-1722, 2021 WL 1521724, at \*4 (M.D. Pa. Apr. 16, 2021) ("Challenges to an agreement's . . . validity[] or scope thus all raise questions of arbitrability.").

## IV.   <u>CONCLUSION</u>

Accordingly, for the reasons stated above, **IT IS** on this 24th day of June 2026;

**ORDERED** that Defendants' motion to compel arbitration (ECF No. 36) is **GRANTED**; and it is further

**ORDERED** that Plaintiff shall submit his claim[5] to arbitration within thirty (30) days of the date of this Opinion and Order; and it is finally

**ORDERED** that this matter is **STAYED** and **ADMINISTRATIVELY TERMINATED** pending the outcome of the arbitration proceedings.

**SO ORDERED**.

*/s/ Claire C. Cecchi*
**CLAIRE C. CECCHI, U.S.D.J.**

---

[5] The CSA provides that "if putative class or representative claims are initially brought by either party in a court of law, and a motion to compel arbitration is brought by any party, then the court shall decide whether this agreement permits class proceedings."  Moving Br. at 26 (quoting ECF No. 36-6 § 14.C(c)).  In addition, the CSA expressly prohibits arbitration on a class-wide basis. *Id.* at 27 ("YOU AND HYUNDAI AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING TO THE MAXIMUM EXTENT PERMITTED BY LAW." (quoting ECF No. 36-6 § 14.C(e)).  Therefore, Plaintiff may only arbitrate "on an individual, non-class basis." *Glover v. Merrick Bank*, No. 24-7085, 2025 WL 4945594, at \*4 (D.N.J. May 13, 2025); *see Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 753 (3d Cir. 2016).